UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT CROSSON,

                    Plaintiff,          Civil Action No.: 14-13607
                                         Honorable Sean F. Cox
                    v.                    Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                    Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [R. 13, 15]

      Plaintiff Robert Crosson appeals a final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application

for disabled child's insurance benefits under the Social Security Act (the

"Act"). Both parties have filed summary judgment motions, referred to this

Court for a Report and Recommendation pursuant to 28 U.S.C. §

636(b)(1)(B). The Court finds that the decision by the administrative law

judge ("ALJ") is not supported by substantial evidence and that Crosson

suffers from an intellectual disability as defined by Listing 12.05(C). The

Court thus **RECOMMENDS** that:

- the Commissioner's motion **[R. 15]** be **DENIED**;

- Crosson's motion **[R. 13]** be **GRANTED**; and,

- the Commissioner's decision be **REVERSED** and **REMANDED** for an

  award of benefits pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   BACKGROUND

### A.   Crosson's Background and Disability Application

Born on September 27, 1992, Crosson was 18 years old when he

applied for benefits on May 6, 2011.  [R. 8-2, Tr. 21, 23].  In 1994, Crosson

was diagnosed with neurofibromatosis type 1 [NF-1], a genetic disorder

from which his mother died in 1998, so his grandparents adopted him.[1]  [R.

8-7, Tr. 306, 334].  NF-1 causes neurofibromas (lesions) that Crosson

began developing when he was very young and, by 2011, they were

extensive and covered his entire chest, abdomen and back.  [*Id.*, Tr. 269,

286-87, 290, 323].  At a young age, he was additionally found to

experience a "quite severe" deformity of his feet and poor vision, both

associated with his NF-1.  [*Id.*, Tr. 300, 307-10].

In 1995, Lester Weiss, M.D., who specializes in medical genetics,

recommended that Crosson be evaluated for speech and language delays;

Crosson was demonstrating such delays and they are common for people

who suffer from NF-1.  [R. 8-7, Tr. 318-19].  According to Jacquelyn

---

[1] Thus, some of the records refer to Suzanne Crosson as Crosson's grandmother, as others refer to her as his mother.

2

Roberson, M.D., the Division Head of Henry Ford Hospital's Genetics Clinic, learning disabilities are more common with NF-1, and Crosson was enrolled in an early intervention program for learning delays by 1999. [*Id.,* Tr. 280, 300-02]. Crosson's medical records reflect that he continued to be considered mentally impaired and to be enrolled in special education. [R. 8-7, Tr. 339-41, 343, 359, 362, 364, 367, 371, 406, 453].

Crosson received Social Security benefits until he turned 18 years old, after which he received a notice that he was no longer entitled to benefits. [R. 8-4, Tr. 95]. He filed a new claim for benefits and was denied, so he filed a request for an administrative hearing. [*Id.*, Tr. 85-86]. The ALJ held a hearing on October 22, 2102, during which Crosson, his grandmother and a vocational expert (VE) testified. [R. 8-2, Tr. 38-70]. In a November 15, 2013 written decision, the ALJ found Crosson not disabled. [*Id.*, Tr. 18-32]. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. [*Id.*, Tr. 1-3]. Crosson timely filed for judicial review. [R. 1].

### B.    The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A). Although Crosson is seeking child's insurance

benefits, he is over 18 years old, so his application must be evaluated

under the adult standard for determining disability. 42 U.S.C. §

402(d)(1)(B)(ii).

Under that standard, the Commissioner determines whether an

applicant is disabled by analyzing five sequential steps. First, if the

applicant is "doing substantial gainful activity," he or she will be found not

disabled. 20 C.F.R. § 404.1520(a)(4). Second, if the claimant has not had

a severe impairment or a combination of such impairments[2] for a

continuous period of at least 12 months, no disability will be found. *Id.*

Third, if the claimant's severe impairments meet or equal the criteria of an

impairment set forth in the Commissioner's Listing of Impairments, the

claimant will be found disabled. *Id.* If the fourth step is reached, the

Commissioner considers its assessment of the claimant's residual

functional capacity ("RFC"), and will find the claimant not disabled if he or

she can still do past relevant work. *Id.* At the final step, the Commissioner

reviews the claimant's RFC, age, education and work experiences, and

determines whether the claimant could adjust to other work. *Id.* The

---

[2] A severe impairment is one that "significantly limits [the claimant's]
physical or mental ability to do basic work activities." §§ 1520(c).

claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Crosson was not disabled. She first found that Crosson had not engaged in substantial gainful activity since his alleged onset date of February 16, 1994 application date. [R. 8-2, Tr. 23]. The ALJ determined that Crosson had the severe impairments of neurofibromatosis and cognitive disorder. [*Id.*]. Next, the ALJ concluded that none of Crosson's impairments, either alone or in combination, met or medically equaled the severity of the listed impairments. [*Id.*, Tr. 23-25].

The ALJ then found that Crosson had the residual functional capacity (RFC) to perform light work, except that he could not kneel, crawl, climb ladders, ropes or scaffolds, or work around unprotected heights or moving mechanical parts. [*Id.,* Tr. 26]. The ALJ further limited Crosson to simple, routine tasks and making simple work-related decisions. [*Id.*].

After considering Crosson's age, education, work experience, RFC and the testimony of the VE, the ALJ determined that he was able to perform work in the national economy, and was not disabled. [*Id.*, Tr. 31].

## II.   ANALYSIS

5

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards. "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723. *See also Rogers*, 486 F.3d at 249. In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

6

The Commissioner must also adhere to its own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless. *Id.* at 655-56. On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless. *Id.*; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Gentry*, 741 F.3d at 729.

Crosson argues that the ALJ's decision, including her determination that his condition did not meet a listing, is not supported by substantial evidence. The Court agrees.

## A.

Specifically, the ALJ erred by finding that Crosson did not meet Listing 12.05(C), which applies to claimants with intellectual disabilities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). "To satisfy Listing 12.05(C), a claimant must demonstrate: (1) valid verbal, performance, or full scale IQ of 60 through 70; (2) evidence of deficits in adaptive functioning initially manifested before age 22; and, (3) an additional and significant work-

7

related limitation of function." *Ware v. Colvin*, No. 5:13-CV-00991, 2014 WL 584752, at *4 (N.D. Ohio Feb. 12, 2014). Here, the ALJ acknowledged that a consultative examiner found Crosson to have a full scale IQ of 68 (and the Commissioner concedes this point). [R. 8-2, Tr. 25; R. 15, PgID 568]. Nathalie Menendes, Psy.D determined that Crosson had that full scale IQ on January 17, 2013. [R. 8-7, Tr. 473].

However, the ALJ found that Crosson's condition did not meet the requirements of Listing 12.05(C) because "the record does not suggest that [he] has any other significant work-related limitation of function or listing-level deficits in adaptive functioning," as demonstrated by Crosson's activities of daily living, including his attendance at a "post-secondary trade school" five days a week and supervised janitorial work. [R. 8-2, Tr. 25]. These conclusions are not supported by substantial evidence and, in fact, the record demonstrates conclusively that they are contrary to the regulations and factually unsustainable.

**B.**

First, the regulations tie the additional impairment required by Listing 12.05(C) to the step two finding of severe impairments as defined by § 404.1520(c). "For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly

8

limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A).  While the Sixth Circuit has yet to weigh in on whether a step two finding of an additional impairment is conclusive, "[t]hose circuit courts that have considered the issue have uniformly concluded that, where an ALJ determines, at step two of the sequential analysis, that an impairment is severe, that impairment is sufficient to satisfy the significant limitations requirement of Listing 12.05(C)."  *Switzer v. Colvin*, No. 1:13-CV-01919, 2014 WL 2611945, at *9 (N.D. Ohio June 11, 2014) (citing *Cook v. Bowen*, 797 F.2d 687, 690-91 (8th Cir. 1986); *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir.1985); *Nieves v. Sec'y of Health and Human Servs.*, 775 F.2d 12, 14 (1st Cir.1985); and *Edwards v. Heckler*, 736 F.2d 625, 631 (11th Cir.1984)).  *See also Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997) (agreeing that "§ 12.05C limitation is significant if the claimant suffers from a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function.").

Here, the ALJ found at step two that Crosson's neurofibromatosis constituted a severe impairment because it significantly limits his ability to perform basic work activities.  [R. 8-2, Tr. 23].  She later reiterated that the

9

record showed that Crosson's "neurofibromatosis limits his ability to perform work-related activity," and thus imposed limitations within the physical RFC.  [*Id.*, Tr. 30].  Consequently, the ALJ's determination that the record fails to show that Crosson has any other significant work-related limitation of function was internally inconsistent, contrary to the regulation, and thus not supported by substantial evidence.

## C.

What is left to consider is whether Crosson exhibited deficits in adaptive functioning that initially manifested before age 22.  The applicable regulation describes adaptive activities including "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  § 12.00(C)(1).  These activities are evaluated for the purpose of identifying the claimant's level of independence.  "In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction."  *Id.*

Notably, the Social Security Administration's definitions of mental

10

retardation [MR] is "consistent with, if not identical to, the definitions of MR used by the leading professional organizations."  Technical Revisions to Medical Criteria for Determination of disability, 67 Fed. Reg. 20018-01 (April 24, 2002).  This report cites, as an example, the American Psychiatric Association's *Diagnosistic & Statistical Manual of Mental Disorders'* (DSM) definition of MR as including limitations in adaptive functioning.  *Id.*  The current version of the DSM describes adaptive function as referring to "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background" and accounts for "adaptive reasoning in three domains: conceptual, social, and practical," and as referring to a person with a person with an intellectual disability that necessitates "ongoing support in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community."  DSM-V at 37-38.  These definitions are relevant for determining whether a claimant's condition meets Listing 12.05(C).  *See, e.g.*, *Wells v. Colvin*, No. CV2014106WOBCJS, 2015 WL 5476111, at *5 (E.D. Ky. Sept. 9, 2015); *Davis v. Colvin*, No. 2:10–cv–88, 2015 WL 3504984, at *3 (M.D.Tenn. May 28, 2015); *Gardner v. Colvin*, No. 14-4048-SAC, 2015 WL 4598802, at *4 (D. Kan. July 29, 2015).

11

Thus, the applicable definitions of adaptive functioning require an assessment of the claimant's ability to function independently. In this case, the record shows that Crosson needs ongoing support in order to perform adequately at work and at home.

**D.**

The ALJ cited Crosson's attendance at a "post-secondary trade school five days per week" and his performance of "supervised janitorial work through his school" as evidence that he did not have deficiencies in adaptive functioning. [R. 8-2, Tr. 25]. The fallacy in the ALJ's reasoning is that Crosson was not attending a "trade school,"[3] and the record is devoid of evidence that he was capable of working independently.

Crosson was placed in a Secondary Transitional Education Program (STEP) Transitions Center by an Individualized Educational Planning Team (IEPT) on March 29, 2011, after he turned 18. [R. 8-6, Tr. 193-221]. The IEPT included general education and special education teachers. [*Id.*, Tr. 193, 195]. Crosson was found to have many strengths, but it was noted that he would experience challenges without special education; that he needed support with writing and math calculations; that he needed

---

[3] The Commissioner alleges that Crosson went to a "trade school," but at least acknowledges that it was "for people with disabilities." [R. 15, PgID 559].

12

specialized instructions in English, science, social studies and math; and that for testing, he needed tests read aloud to him, extended time and access to class notes.  [*Id.*, Tr. 197].  The IEPT scheduled Crosson to begin the STEP program at the SISD Transition Center on September of 2011, for 15 hours per week.  [*Id.*, Tr. 215].  The goal of the transitional program, to be implemented by a special education teacher and paraprofessional staff, was for Crosson to demonstrate employability in a work environment by April 19, 2012.  [*Id.*, Tr. 202].

At the October 2012 hearing, Crosson testified that he was still attending the transition school from 9:45 a.m. to 12:15 p.m., five days a week, and performed unpaid, supervised janitorial work.  [R. 8-2, Tr. 47-49].  He was never allowed to work alone.  [*Id.*, Tr. 49].  His grandmother indicated that he could attend the transition program until he turns 26.  [*Id.*, Tr. 64].

Crosson's participation in the transitional program is, by definition, evidence that he was not capable of independent employability when he turned 18.  He was enrolled in the program in order to allow him *to achieve employability*, not because he already had that capability.  He was still doing only unpaid, supervised work, and only doing so for about 15 hours per week at the time of the hearing.  While the ALJ found that Crosson's

13

attendance at the transition school demonstrated that he did not have deficiencies in adaptive functioning, his attendance there unambiguously proves the opposite.

### E.

In addition to the evidence that Crosson cannot work independently, the record further shows that he cannot live independently. Crosson's grandmother, Suzanne Crosson, testified, "He wouldn't be able to [live alone] right now, that's why I'm sending him to the transition center to learn how to live on his own." [R. 8-2, Tr. 59]. Her testimony was buttressed by the August 1, 2011 opinion of long-time treating physician Caroline Scott, M.D., that Crosson had neurofibromatosis with mild to moderate mental retardation, and that these conditions are not remediable.[4] [R. 8-7, Tr. 276]. Dr. Scott concluded, "Robert is not capable of independent living. He will require supervision for the rest of his life. He is currently living with his mother and he remains dependent on her for his physical and financial needs." [*Id.*].

The ALJ did not mention Mrs. Crosson's testimony that Crosson could not live independently, but gave little weight to her testimony in

---

[4] The Court agrees with Crosson that the ALJ's reliance on the fact that he was not being treated for his congenital neurofibromatosis makes little sense given the evidence that that condition was not remediable.

14

general because of her close relationship with Crosson and the "possibility

that her statements were influenced by a desire to help the claimant cannot

be ignored. . . ." [R. 8-2, Tr. 30]. The ALJ likewise dismissed Dr. Scott's

opinion that Crosson suffered from mild to moderate mental retardation as

unsupported by her treatment notes, and gave Dr. Scott's opinion that

Crosson could not live independently little weight because it is "without

substantial support from the medical evidence and the record as a whole,

including Dr. Scott's own treatment notes and the clinical examination

findings of other physicians." [*Id.*, Tr. 29-30]. This analysis was deficient.

The "treating physician rule" requires an ALJ to give controlling

weight to a treating physician's opinions regarding the nature and severity

of a claimant's condition when those opinions are well-supported by

medically acceptable clinical and diagnostic evidence, and not inconsistent

with other substantial evidence. *Gentry*, 741 F.3d at 723, 727-29; *Rogers*,

486 F.3d at 242-43. If an ALJ gives less than controlling weight to a

treating source's opinion, she must provide "good reasons" for doing so

that are "supported by the evidence in the case record, and … sufficiently

specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons

for that weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th

15

Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL

374188, at *5 (July 2, 1996)).

The treating physician rule is predicated on the detailed, longitudinal

picture and unique perspective that such sources provide:

> 'Generally, we give more weight to opinions from your treating
> sources, since these sources are likely to be the medical
> professionals most able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained
> from the objective medical findings alone or from reports of
> individual examinations, such as consultative examinations or
> brief hospitalizations.'

*Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011)

(quoting 20 C.F.R. § 404.1527(d)(2)).  For these reasons, a treating

physician's opinion is entitled to great deference in all cases.  *Gentry*, 741

F.3d at 723.

Dr. Scott's records date back to 1995 (when Crosson was three

years old), and include not only her treatment notes but also myriad reports

from specialists to whom Dr. Scott had referred Crosson.  [*See* R. 8-7, Tr.

277-455].  Indeed, *all* of the treating medical reports in the record are

located within Dr. Scott's files.  [*Id*.].  Dr. Scott is the epitome the type of

treating physician whose longitudinal picture brings a unique perspective

that cannot be obtained from objective medical records alone or from

consultative examiners; she is the epitome of the type of treating physician

16

to whom the ALJ should have given great deference.  The ALJ's one-sentence dismissal of her opinion that Crosson cannot live independently is patently insufficient.

Ironically, after disregarding Dr. Scott's years of treating Crosson, the ALJ gave great weight to the opinion of Dr. Menendes in part because she examined Crosson once.  [R. 8-2, Tr. 29-30].  Of further note, Dr. Menendes's report is not contrary Dr. Scott's opinion that Crosson cannot live independently.  Dr. Menendes did not indicate that Crosson can live independently, only that he can "function independently in many areas of his life."  [R. 8-7, Tr. 471].  Dr. Menendes concurred with Dr. Scott's conclusion that Crosson was incapable of managing his own finances.  [*Id.*, Tr. 474.].  Moreover, Dr. Menendes's determination that Crosson had a full IQ of 68 is fully supportive of Dr. Scott's opinion that he suffers from mental retardation.  As noted by the Commissioner, Listing 12.05(C) was previously designated as "mental retardation," and included the full IQ of 60 to 70 criteria.[5]  *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (describing Listing 12.05(C) before the name change).[6]

---

[5] The Commissioner described the terminology change at R. 15, PgID 567, n. 4.

[6] Dr. Menendes also found Crosson's hygiene to be marginal and his smell to be somewhat unpleasant.  [R. 8-7, Tr. 471].  She further noted that Crosson did not drive or have a driver's license.  [*Id.*].  Crosson and his

Simply put, the ALJ cited no evidence in the record that contradicts Dr. Scott's opinion that Crosson is mentally retarded and incapable of living independently.

Moreover, the ALJ's reasoning for dismissal of Mrs. Crosson's testimony because of her relationship with Crosson is legally erroneous. According to 20 C.F.R. § 404.1513(d)(4), the ALJ may consider non-medical sources including family members and friends.  The Sixth Circuit has, furthermore, found that an ALJ's duty to investigate and fully develop the record requires consideration of available lay witness testimony.  "If lay witness testimony is provided, the ALJ cannot disregard it without comment, and must give reasons for not crediting the testimony that are germane to each witness."  *Maloney v. Comm'r of Soc. Sec.*, 480 Fed. Appx. *804, *810 (6th Cir. 2012).  Nonetheless, an ALJ's insufficient consideration of lay witness testimony is harmless error unless it would affect the disability decision and is fully supported by the reports of treating physicians.  *Id.; Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004).

If a lay witness's close relationship with a claimant were enough to

---

grandmother independently noted that he does not drive.  [R. 8-2, Tr. 51; R. 8-6, Tr. 166, 176].  His marginal hygiene and inability to drive support a finding that he has limitations in his adaptive functioning.  § 12.00(C)(1); *Gethin v. Colvin*, No. 3:14-CV-53-DW, 2014 WL 4104130, at *11 (W.D. Ky. Aug. 19, 2014).

disregard her testimony, then § 404.1513(d)(4) would be meaningless; that section specifically allows consideration of testimony by witnesses who are close to the claimant.  Moreover, the ALJ's failure to properly consider Mrs. Crosson's testimony is not harmless because it affects a determination of whether Crosson has deficiencies in adaptive functioning, and is fully supported by Dr. Scott.

**F.**

Although, for the reasons stated above, the ALJ's decision failed to comply with the relevant legal standards, the Court can award Crosson benefits only if "all essential factual issues have been resolved" and "the record adequately establishes [his] entitlement to benefits." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Brooks v. Comm'r of Soc. Sec.*, 531 Fed. Appx. 636, 644 (6th Cir. 2013).  A record establishes entitlement to benefits only "where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176; *see also Brooks*, 531 Fed. Appx. at 644.

As noted above, the ALJ and the Commissioner conceded that Crosson had an IQ within the criteria of Listing 12.05(C), and the ALJ's step two finding that Crosson's neurofibromatosis constituted a severe

19

impairment was conclusive with respect to whether he had an additional significant limitation as required by Listing 12.05(C).  Finally, proof that Crosson could not work or live independently was strong, and evidence to the contrary is lacking; the record demonstrates overwhelming that Crosson manifested deficits in adaptive functioning prior to the age of 22, as required to meet Listing 12.05(C).

In light of this overwhelming evidence, the Court recommends that this matter be remanded for an award of benefits.

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Crosson's motion [R. 13] be **GRANTED**, the Commissioner's motion [R. 15] be **DENIED**, and the Commissioner's decision be **REVERSED** and this matter **REMANDED** for an award of benefits pursuant to sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: February 16, 2016

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ.

P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

21

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 16, 2016.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager